**Shimon Yiftach**
**Bronstein, Gewirtz& Grossman, LLC**
**1625 W. Olympic Blvd, Suite 910**
**Los Angeles, CA 90015**
**Counsel to Plaintiff**
**Attorneys for Plaintiff**
**UNITED STATES DISTRICT COURT**
**NORTHERNDISTRICT OF CALIFORNIA**



FILED

FEB 0 7 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*EDL*

| | |
|---|---|
| SENTA WEISSMANN,Derivativelyon behalf of HEWLETT-PACKARD COMPANY, | C No. **13    0557** |
| | **VERIFIED SHAREHOLDER** |
| Plaintiff, | **DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| LEO APOTHEKER, MARGARET C. WHITMAN, CATHERINE A. LESJAK, JAMES T. MURRIN and MICHAEL R. LYNCH, DELOITTE LLP, KPMG LLP, PERELLA WEINBERG PARTNERS UK LLP, BARCLAYS CAPITAL SECURITIES LTD., G. KENNEDY THOMPSON, RAJIV L. GUPTA, SHUMEET BANERJI, GARY M. REINER, JOHN H. HAMMERGREN, MARC L. ANDREESSEN, RAYMOND J. LANE, PATRICIA F. RUSSO, ANN M. LIVERMORE, RALPH V. WHITWORTH, SHANE V. ROBISON, LAWRENCE V. BABBIO JR., SARI V. BALDAUF, DOMINIQUE SENEQUIER, | |
| Defendants, | |
| -and- | |
| HEWLETT-PACKARD COMPANY, a Delaware Corporation, Nominal Defendant. | |

Plaintiff  SentaWeissmann("Plaintiff"),  derivatively  on  behalf  of  Hewlett-Packard

Company,  by  his  undersigned  attorneys,  for  his  complaint  against  defendants,  alleges  the

following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regardingHewlett-Packard Company ("HP" or the "Company"), analysts' reports and advisories about the Company, information readily obtainable on the Internet, and incorporated by reference public filings of Autonomy Corporation PLC("Autonomy"), including its annual reports for financial years 2009 and 2010.Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a verified shareholder derivative action brought by Plaintiff on behalf of HP, seeking to recover damages from current and former HP officers and directors, current and former Autonomy officers and directors, Deloitte LLP, KPMG LLP, Perella Weinberg Partners UK LLP ("Perella Weinberg"), and Barclays Capital Securities Ltd. ("Barclays") caused by defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duty, waste of corporate assets, negligence, unjust enrichment, and aiding and abetting of the foregoing. The defendants' wrongdoings caused billions of dollars of damage to HP, its reputation, goodwill, and intangible assets.

2.      HPprovides imaging and printing systems, computing systems, and information technology services for business and home. The Company's products include laser and inkjet printers, scanners, copiers and faxes, personal computers, workstations, storage solutions, and other computing and printing systems.

2

3.     Throughout the relevant time period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliancepolicies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:(i) at the time of the acquisition of Autonomy, Autonomy's operating results and historic growth were the product of accounting improprieties, including the mischaracterization of sales of low-margin hardware as software and the improper recognition of revenue on transactions with its business partners even where customers did not purchase the products; and (ii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

4.     On November 20, 2012, HP disclosed a non-cash impairment charge of $8.8 billion related to the HP's acquisition of Autonomy due to Autonomy's usage of "accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company." Since HP purchased Autonomy for $11.1 billion, this write down equals about 80% of the purchase price.

5.     On this news, HP shares declined $1.59 per share or nearly 12%, to close at $11.71per share on November 20, 2012.

6.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of HP's securities, HP and its shareholders have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter under 28 U.S.C. §1331 because it includes claims under the Exchange Act. Pursuant to 28 USC § 1367(a) over all other claims because they are so related that they form part of the same case or controversy.

3

8.     Venue is proper in this District under28 U.S.C. §1391(a):HP's principal place of business is located within this District; one or more of the defendants either resides in or maintains executive offices in this District; a substantial portion of the transactions and wrongs discussed herein, occurred in this District; and Defendants have received substantial compensation in this District by doing business here and performing numerous activities that had an effect here.

9.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

10.     This Court has jurisdiction over every defendant because each defendant is either a corporation that does business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with the District to render jurisdiction permissible under the traditional notions of fair play and substantial justice.

11.     A substantial portion of the transactions and wrongdoings that gave rise to this action occurred in the County of San Jose, and as such, this action could be properly assigned to the San Jose division of this Court.

## PARTIES

12.     PlaintiffSentaWeissmann, as set forth in the attached Certification,is an HP shareholder and has continuously held HP stocks relevant time period.

13.     Nominal Defendant HP is a Delawarecorporation with principal executive offices located at3000 Hanover Street, Palo Alto, CA 94304.HP's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HPQ." HP is a global provider of

4

computers, printers, software, and other products to individuals and businesses.

14.     Defendant Leo Apotheker ("Apotheker") was HP'sCEO, President, and Director from November 2010 until September 2011.

15.     DefendantMargaret C. Whitman ("Whitman") has been the Company'sPresident and CEO since September 22, 2011. Prior to being named the Company's CEO, Defendant Whitman served as a member of the Company's Board of Directors ("Board") and continues to serve as a director.

16.     Defendant Catherine A. Lesjak ("Lesjak")has been HP's Chief Financial Officer and Executive Vice President since January 2007. She has worked at HP for 24 years in various financial leadership positions.

17.     Defendant James T. Murrin ("Murrin") was HP's Senior Vice President, Chief Accounting Officer and Controller until May 1, 2012. During the relevant time period, defendant Murrin sold 132,500 shares of his HP stock for proceeds of nearly $3.5 million while in the possession of materially adverse and non-public information.

18.     Defendant Michael R. Lynch ("Lynch")served as HP's Executive Vice President, Information Management from November 2011 to May 2012. From 1996 through October 2011, Defendant Lynch was Autonomy's CEO and Co-Founder. Lynch resigned from HP at approximately the same time that HP learned of the accounting fraud related to the Autonomy acquisition. As the CEO of Autonomy, Lynch was responsible for Autonomy's entire operations, including its financial statements and internal controls. Lynch was the leader in charge of the sale of Autonomy to HP. He is responsible for inducing HP to purchase Autonomy based on fraudulent financials and an inflated price. Lynch misrepresented Autonomy's revenue and growth rate.

5

19.     Defendant SushovanHussain ("Hussain") served as Autonomy's Chief Financial Officer from June 2001 through October 2011.  Defendant Hussain was appointed a director on Autonomy's Board in June 2003.

20.     Defendant G. Kennedy Thompson ("Thompson") has been an HP director since 2006.  He is a member (since February 2011) and chairman (since September 2011) of HP's Audit Committee.  He was also a member of HP's Finance and Investment Committee from February 2011 to September 2011.

21.     Defendant Rajiv Gupta has been HP's lead independent director since September 2011 and has been a director since January 2009.  He was also a member of HP's Audit Committee since April 2012.  He was also a member of HP's Finance and Investment Committee from September 2011 to January 2012.

22.     Defendant ShumeetBanjeri has been an HP director since January 2011. Banjeri was also a member of HP's Audit Committee and Finance and Investment Committee since February 2011.

23.     Defendant Gary M. Reiner has been an HP director since January 2011.  He has also been a member of the Audit Committee since September 2012 and the Finance and Investment Committee since February 2012.

24.     Defendant John H. Hammergren has been an HP director since 2005.  He has been the chairman of HP's Finance and Investment Committee since February of 2011.

25.     Defendant Marc. L. Andreessen has been an HP director since 2009.

26.     Defendant Raymond J. Lane has been HP's Executive Chairman of the Board since 2011.  He has been a director since November 2010.  He was also the non-Executive Chairman of the Board from November 2010 to September 2011.

6

27. Defendant Patricia F. Russo has been an HP director since January 2011.

28. Defendant Ann M. Livermore has been an HP director since June 2011. She was also a member of HP's Finance and Investment Committee since February 2012.

29. Defendant Ralph V. Whitworth has been an HP director and member of the HP's Finance and Investment Committee since February 2011.

30. Defendant Shane V. Robison was HP's Executive Vice President and Chief Strategy and Technology Officer from May 2002 to November 2011. Along with Apotheker, Robinson was a key person behind the Autonomy acquisition.

31. Defendant Lawrence T. Babbio, Jr. was an HP director from 2002 to March 2012. Babbio was also a member for the Audit Committee from January 2012 to March 2012 and a member of the Finance and Investment Committee from February 2011 to September 2011.

32. Defendant Sari M. Baldauf was an HP director from 2006 to March 2012. Baldauf was also a member of the Audit Committee from January 2010 to February 2012.

33. Defendant Dominique Senequier was an HP director from January 2011 to March 2012. Senequier was also a member of the Audit Committee from February 2011 to December 2011 and a member of the Finance and Investment Committee from February 2011 to September 2011.

34. The defendants referenced above in ¶¶ 14-33are sometimes referred to herein as the "Individual Defendants." The Individual Defendants knowingly or recklessly failed to conduct adequate due diligence of Autonomy before HP purchased it. Moreover, the Individual Defendants knowingly or recklessly provided improper statements regarding HP's financial status and business operations. These improper statements (a) concealed serious accounting improprieties, disclosure failures, and misrepresentations that overvalued Autonomy when HP

7

bought it, and (b) failed to disclose that HP grossly overpaid for Autonomy, delaying HP from taking the necessary impairment charge to HP's goodwill and acquired intangible assets. While HP's inflated stock price was still concealed, Individual Defendants implemented repurchases of HP's stock at these inflated prices.

35.     Defendant Deloitte LLP is a United Kingdom limited liability partnership and the United Kingdom member firm of Deloitte Touche Tohmatsu Limited with principal executive offices at 2 New Street Square, London, EC4A 3BZ, United Kingdom. Deloitte LLP served as Autonomy's independent auditor prior to and during HP's acquisition. Deloitte consciously disregarded numerous obvious signals that alerted it of Autonomy's accounting improprieties and its failure to follow auditing standards.

36.     Defendant KPMG LLP is the US member firm of KPMG International. KPMG is a limited liability company with its principal executive offices at 345 Park Avenue, New York, NY. HP hired KPMG to conduct finance and accounting due diligence of Autonomy, which included a review of Deloitte's audit of Autonomy. KPMG consciously disregarded numerous obvious signals that alerted it of Autonomy's accounting improprieties and its failure to follow auditing standards.

37.     Defendant Perella Weinberg is a United Kingdom limited liability partnership with principal executive offices at 20 Grafton Street, London W1S 4DZ, United Kingdom. Perella Weinberg served as joint financial advisor to HP for purposes of HP's acquisition. Perella Weinberg consciously disregarded numerous obvious signals that alerted it of Autonomy's accounting improprieties and its failure to follow auditing standards.

38.     Defendant Barclays is the investment banking division of Barclays Bank PLC with principal executive offices at 5 The North Colonnade, Canary Wharf, London E14 4BB,

8

United Kingdom. Barclays as joint financial advisor and corporate broker to HP in connection with the Autonomy acquisition. Barclays consciously disregarded numerous obvious signals that alerted it of Autonomy's accounting improprieties and its failure to follow auditing standards.

## SUBSTANTIVE ALLEGATIONS

### Background

39.     HP is a leading global provider of products, technologies, software, solutions and services to individual consumers, small and medium sized businesses and large enterprises, including customers in the government, health and education sectors. HP's operations are organized into seven business segments: the Personal Systems Group; Services; the Imaging and Printing Group; Enterprise Servers; Storage and Networking; HP Software; and HP Financial Services and Corporate Investments.

### Materially False and Misleading
### Statements Issued

40.     On August 18, 2011, after the market closed, in a press release, HP announced that it acquired all of the outstanding shares of Autonomy for £25.50 or $42.11 per share in a cash offer. The press release stated in relevant part the following:

> The transaction was unanimously approved by the boards of directors of both HP and Autonomy. The Autonomy board of directors also has unanimously recommended its shareholders accept the Offer.

> Based on the closing stock price of Autonomy on August 17, 2011, the consideration represents a one day premium to Autonomy shareholders of approximately 64 percent and a premium of approximately 58 percent to Autonomy's prior one month average closing price. The transaction will be implemented by way of a takeover offer extended to all shareholders of Autonomy. A document containing the full details of the Offer will be dispatched as soon as practicable after the date of this release. The acquisition of Autonomy is expected to be completed by the end of calendar 2011.

- Enhances HP's financial profile: Autonomy's strong growth and profit margin profile complements HP's efforts to improve its business mix by focusing on enterprise software and solutions. Autonomy has a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010.
- Accretive to HP's earnings: HP expects the acquisition to be accretive to non-GAAP earnings per share for HP shareholders in the first full year following completion.

28.     On September 13, 2011, HP filed a prospectus on Form 424B5 with the SEC for the offer and sale of $4.6 billion in fixed and floating-rate notes with maturities reaching out to September 14, 2041. The prospectus informed investors that the proceeds of the $4.6 billion offering would be "for general corporate purposes." The September 13, 2011 prospectus incorporated by reference management's discussion and analysis of the Services segment's financial performance as reported in the HP's third quarter 2011 Form 10-Q, which stated in relevant part:

Services net revenue increased 3.6% (decreased 1.9% when adjusted for currency) and 1.0% (decreased 1.4% when adjusted for currency) for the three and nine months ended July 31, 2011, respectively. Infrastructure Technology Outsourcing net revenue increased by 5% and 2% for the three and nine months ended July 31, 2011, respectively. An increase in product-related revenue and a favorable currency impact were partially offset by a shortfall in short-term project contracts with existing clients. Technology Services net revenue increased by 5% and 2% for the three and nine months ended July 31, 2011, respectively, due primarily to growth in our consulting business and a favorable currency impact, the effect of which was partially offset by reduced sales of third-party hardware. Application Services net revenue increased by 2% and 1% for the three and nine months ended July 31, 2011, respectively. The increase for both periods was driven by a favorable currency impact, the effect of which was partially offset by declines in short-term project work and primarily to the ExcellerateHRO divestiture completed at the end of the third quarter of fiscal 2010.

29.     Also on September 13, 2011, Defendant Apothekerparticipated at the Deutsche Bank Technology Conference and represented the following in relevant part:

Autonomy – I'm sure we have many more questions onAutonomy, but, just to position that squarely in everybody's minds, the idea around Autonomy is to

really strengthen HP's capabilities tremendously in this whole notion of data. We talked about data in San Francisco. We will talk a lot about data, probably, today, as well, structured and unstructured. And, therefore, Autonomy is a very important asset.

\*\*\*

And let me just try to build on that and help you understand how we came to the valuation of Autonomy. We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this. Just to make sure everybody understands. Autonomy will be, on day one, accretive to HP. For FY 2012, Autonomy, once we integrate it, is accretive to HP.

Now, we have identified five synergy possibilities – five synergy leverages on how we can build up the Autonomy business and how we can synergize it between HP and Autonomy. And I can walk you through that, through these various elements. But just take it from us. We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy. And it will give a great return to our shareholders.

30. On September 22, 2011, HP terminated Defendant Apotheker as its CEO and announced that Defendant Whitman would take over as the new President and CEO of HP.

31. On September 22, 2011, the Company hosted a conference call where Defendant Whitman stated the following in relevant part:

Second, the Autonomy acquisition, which I'm excited about, is proceeding as planned, and is expected to be completed by the end of the calendar year.

41. On October 3, 2011, HP issued a press release announcing that it had acquired control of Autonomy. The press release stated the following in relevant part:

Holders of 213,421,299 Autonomy shares have accepted HP's previously announced offer to purchase the entire share capital of Autonomy at a price of £25.50 per share in cash, representing approximately 87.34 percent of the current issued share capital of Autonomy. As such, all conditions relating to the offer have now been satisfied, allowing HP to acquire control of Autonomy.

42. On November 21, 2011, HP issued a press release announcing financial results for the fiscal year ended October 31, 2011. For the fourth quarter, HP reported net earnings of $239 million, or $0.12 diluted earnings per share ("EPS"), and net revenue of $32.1 billion,as

11

compared to net earnings of $2.5 billion, or $1.10 diluted EPS, and net revenue of $33.3 billion for the same period a year ago. For the fiscal year, HP reported net earnings of $7.1 billion, or $3.32 diluted EPS, and net revenue of $127.2 billion, as compared to net earnings of $8.8 billion, or $3.69 diluted EPS, and net revenue of $126 billion for the same period a year ago.

43.     On December 7, 2011, the Company filed a prospectus on Form 424B5 with the SEC for the offer and sale of $3.0 billion in fixed-rate notes with maturities reaching out to December 9, 2021. The prospectus informed investors that the proceeds of the $3.0 billion offering would be "for general corporate purposes." The December 7, 2011 prospectus incorporated by reference management's discussion and analysis of the Services segment's financial performance during the third quarter of 2011.

44.     On December14, 2011, HP filed an annual report for the fiscal year ended October 31, 2011 on a Form 10-K with the SEC, which was signed by, among others, Defendants Whitman and Lesjakand reiterated the Company's previously announced financial results.     In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Whitman and Lesjakstating that the information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

45.     The Form 10-K stated the following in relevant part concerning the acquisition of Autonomy:

> HP's largest acquisition in fiscal 2011 was its acquisition of Autonomy Corporation plc ("Autonomy"). As of October 31, 2011, HP owned an approximately 99% equity interest in Autonomy, and HP expects to acquire a 100% equity interest before the end of the first quarter of fiscal 2012. Autonomy is a provider of infrastructure software for the enterprise. HP reports the financial results of the Autonomy business in the HP Software segment. The acquisition date fair value consideration of $11 billion consisted of cash paid for outstanding

12

common stock, convertible bonds, vested in-the-money stock awards and the estimated fair value of earned unvested stock awards assumed by HP. In connection with this acquisition, HP recorded approximately $6.6 billion of goodwill and amortizable purchased intangible assets of $4.6 billion. HP is amortizing the purchased intangible assets on a straight-line basis over an estimated weighted-average life of 8.8 years.

46.     On February 22, 2012, HP issued a press release announcing financial results for the first quarter ended January 31, 2012.For the quarter, the Company reported net earnings of $1.5 billion, or $0.73 diluted EPS, and net revenue of $30 billion as compared to net earnings of $2.6 billion, or $1.17 diluted EPS, and net revenue of $32.3 billion for the same period a year ago. For the Company's Software segment, "revenue grew 30% year over year with a 17.1% operating margin, including the results of Autonomy. Software revenue was driven by 12% license growth, 22% support growth and 108% growth in services."

47.     On March 12, 2012, HP filed a quarterly report for the period ended January 31, 2012 on Form 10-Q with the SEC, which was signed by Defendant Lesjakand reiterated the Company's previously announced financial results.     In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Whitman and Lesjak stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

48.     The Form 10-Q stated the following in relevant part concerning the acquisition of Autonomy:

> Additionally, duringthe three months ended January 31, 2012, HP recorded additional goodwill of $224 million in the Software segment due to a change in theestimated fair values of purchased intangible assets and net tangible assets associated with the acquisition of Autonomy Corporation plc("Autonomy"). This increase to goodwill was partially offset by a currency translation adjustment of $106 million on goodwill related toAutonomy subsidiaries whose functional currency is not the U.S. dollar.

13

***

For the first three months of fiscal 2012, the majority of the decrease in gross intangibles was related to a $293 million change in the estimated fair value of Autonomy's purchased intangible assets acquired, $104 million of fully amortized intangible assets which have been eliminated from both the gross and accumulated amortization amounts, and a $92 million reduction in intangibles due to currency translation on intangibles related to Autonomy subsidiaries whose functional currency is not the U.S. dollar.

***

The Software segment contributed favorably to the total HP net revenue change primarily as a result of the acquisition of Autonomy Corporation plc.

***

Software net revenue increased 30.5% (29.1% when adjusted for currency) for the three months ended January 31, 2012 due to revenues from acquired companies, primarily Autonomy, as well as growth in the organic business. Net revenue from services, support and licenses increased by 108%, 22% and 12%, respectively.

49.     On May 23, 2012, the Company issued a press release announcing financial results for the second fiscal quarter ended April 30, 2012. For the quarter, the Company reported net income of $3 billion, or $1.53 diluted EPS, and net revenue of $30.7 billion as compared to net income of $5 billion, or $2.23 diluted EPS, and net revenue of $31.6 billion for the same period a year ago.

50.     On May 23, 2012, Defendant Lynch was fired from HP.

51.     On June 8, 2012, HP filed a quarterly report for the period endingApril 30, 2012 on Form 10-Q with the SEC, which was signed by DefendantLesjak and reiterated the Company's previously announced financial results.     In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Lesjak and Whitman stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

14

52.     The Form 10-Q stated the following in relevant part concerning the acquisition of

Autonomy:

> During the six months ended April 30, 2012, HP recorded additional goodwill of
> $224 million in the Software segment due to a change in the estimated fair values
> of purchased intangible assets and net tangible assets associated with the
> acquisition of Autonomy Corporation plc ("Autonomy"). HP also recorded a net
> increase to goodwill of $213 million as a result of a currency translation
> adjustment on goodwill related to Autonomy subsidiaries whose functional
> currency is not the U.S. dollar.

***

> For the first six months of fiscal 2012, the majority of the decrease in gross
> intangibles was related to $428 million of fully amortized intangible assets which
> have been eliminated from both the gross and accumulated amortization amounts
> and a $293 million change in the estimated fair value of Autonomy's purchased
> intangible assets acquired. The decrease to intangibles was partially offset by a
> net currency translation adjustment of $165 million on intangibles related to
> Autonomy subsidiaries whose functional currency is not the U.S. dollar.

***

> The Software segment contributed favorably to the total HP net revenue change
> primarily as a result of the acquisition of Autonomy Corporation plc.

***

> The net revenue increase for both periods was due to revenues from acquired
> companies, primarily Autonomy, as well as modest growth in the organic
> business, including solid growth in our security support offerings. For the three
> months ended April 30, 2012, net revenue from services, support and licenses
> increased by 72%, 17% and 7%, respectively. For the six months ended April 30,
> 2012, net revenue from services, support and licenses increased by 89%, 19% and
> 10%, respectively.

> For the three and six months ended April 30, 2012, Software earnings from
> operations as a percentage of net revenue decreased by 2.1 percentage points and
> 0.9 percentage points, respectively. The operating margin decrease for both
> periods was due primarily to a lower mix of license revenue, higher deferred
> revenue write-downs and integration costs associated with the Autonomy
> acquisition, the effect of which was partially offset by rate increases in hosted
> license services and lower integration costs associated with our fiscal 2010
> acquisitions.

15

53.     On August 22, 2012, HP issued a press release announcing financial results for the third fiscal quarter ended July 31, 2012. For the quarter, the Company reported net loss of $8.9 billion, or ($4.49) diluted EPS, and net revenue of $29.7 billion as compared to net income of $1.9 billion, or $0.93 diluted EPS, and net revenue of $31.2 billion for the same period a year ago.

54.     On September 10, 2012, HP filed a quarterly report for the period ended July 31, 2012 on Form 10-Q with the SEC, which was signed by Defendant Lesjak and reiterated the Company's previously announced financial results.     In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Lesjak and Whitman stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55.     The Form 10-Q stated the following in relevant part concerning the acquisition of Autonomy:

> Additionally, HP recorded an increase to goodwill of $249 million in the Software segment due to a change in the estimated fair values of purchased intangible assets and net tangible assets associated with the acquisition of Autonomy Corporation plc ("Autonomy").
>
> ***
>
> The Software segment includes $14.6 billion of goodwill, of which $7.7 billion relates to the legacy HP software business and $6.9 billion relates to the Autonomy acquisition. Based on HP's last annual goodwill impairment review completed as of August 1, 2011, the excess of fair value over carrying value of the legacy HP software business was 38% of the carrying value, which is lower than that of HP's other reporting units. At the time of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the carrying value.
>
> ***
>
> For the first nine months of fiscal 2012, the majority of the decrease in gross intangibles was related to $537 million of fully amortized intangible assets which

16

have been eliminated from both the gross and accumulated amortization amounts and a $293 million change in the estimated fair value of Autonomy's purchased intangible assets acquired.

*** 

The Software segment contributed favorably to the total HP net revenue change as a result of the acquisition of Autonomy Corporation plc.

*** 

Software net revenue increased 18.4% (21.0% when adjusted for currency) and 23.3% (23.7% when adjusted for currency) for the three and nine months ended July 31, 2012, respectively. The net revenue increase for both periods was due to revenues from acquired companies, primarily Autonomy. For the three months ended July 31, 2012, net revenue from services, support and licenses increased by 65%, 16% and 2%, respectively. For the nine months ended July 31, 2012, net revenue from services, support and licenses increased by 81%, 18% and 7%, respectively.

For the three and nine months ended July 31, 2012, Software earnings from operations as a percentage of net revenue decreased by 1.5 percentage points and 1.1 percentage points, respectively. The operating margin decrease for both periods was due primarily to a lower mix of license revenue, higher deferred revenue write-downs and integration costs associated with the Autonomy acquisition, the effects of which were partially offset by rate increases in hosted license services and lower deferred revenue write-downs associated with our fiscal 2010 acquisitions than in the prior-year periods.

56.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (i) at the time of the acquisition of Autonomy, Autonomy's operating results and historic growth were the product of accounting improprieties, including the mischaracterization of sales of low-margin hardware as software and the improper recognition of revenue on transactions with its business partners even where customers did not purchase the products; and (ii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

17

## HP FINALLY REVEALS THE TRUTH

57.     On November20, 2012, HP issued a press release announcing financial results for
the fourth fiscal quarter and full year ended October 31, 2012. For the quarter, the Company
reported net loss of $6.9 billion, or ($3.49) diluted EPS, and net revenue of $30 billion as
compared to net earnings of $239 million, or $0.12 diluted EPS, and net revenue of $32 billion
for the same period a year ago. For the full year, the Company reported net loss of $12.7 billion,
or ($6.41) diluted EPS, and net revenue of $120.4 billion as compared to net earnings of $7.1
billion, or $3.32 diluted EPS, and net revenue of $127 billion for the same period a year ago.

58.     Also, on November 20, 2012, the Company issued a press release disclosing a
non-cash impairment charge of $8.8 billion related to the acquisition of Autonomy. The press
release disclosed the following in relevant part:

"HP is extremely disappointed to find that some former members of Autonomy's
management team used accounting improprieties, misrepresentations and
disclosure failures to inflate the underlying financial metrics of the company,
prior to Autonomy's acquisition by HP. These efforts appear to have been a
willful effort to mislead investors and potential buyers, and severely impacted HP
management's ability to fairly value Autonomy at the time of the deal. We remain
100 percent committed to Autonomy and its industry-leading technology."

Additional background:

HP today announced a non-cash impairment charge of $8.8 billion related to
Autonomy in the fourth quarter of its 2012 fiscal year. The majority of this
impairment charge, more than $5 billion, is linked to serious accounting
improprieties, misrepresentation and disclosure failures discovered by an internal
investigation by HP and forensic review into Autonomy's accounting practices
prior to its acquisition by HP. The balance of the impairment charge is linked to
the recent trading value of HP stock and headwinds against anticipated synergies
and marketplace performance.

18

HP launched its internal investigation into these issues after a senior member of Autonomy's leadership team came forward, following the departure of Autonomy founder Mike Lynch, alleging that there had been a series of questionable accounting and business practices at Autonomy prior to the acquisition by HP. This individual provided numerous details about which HP previously had no knowledge or visibility.

HP initiated an intense internal investigation, including a forensic review by PricewaterhouseCoopers of Autonomy's historical financial results, under the oversight of John Schultz, executive vice president and general counsel, HP.

As a result of that investigation, HP now believes that Autonomy was substantially overvalued at the time of its acquisition due to the misstatement of Autonomy's financial performance, including its revenue, core growth rate and gross margins, and the misrepresentation of its business mix.

Although HP's investigation is ongoing, examples of the accounting improprieties and misrepresentations include:

• The mischaracterization of revenue from negative-margin, low-end hardware sales with little or no associated software content as "IDOL product," and the improper inclusion of such revenue as "license revenue" for purposes of the organic and IDOL growth calculations.

o This negative-margin, low-end hardware is estimated to have comprised 10-15% of Autonomy's revenue.

• The use of licensing transactions with value-added resellers to inappropriately accelerate revenue recognition, or worse, create revenue where no end-user customer existed at the time of sale.
This appears to have been a willful effort on behalf of certain former Autonomy employees to inflate the underlying financial metrics of the company in order to mislead investors and potential buyers. These misrepresentations and lack of disclosure severely impacted HP management's ability to fairly value Autonomy at the time of the deal.

59. HP also held a conference call to discuss its financial results. In regard to the

impairment charge, Defendant Whitman stated the following in relevant part:

The majority of this impairment charge is linked to serious accounting improprieties, disclosure failures and outright misrepresentations that occurred prior to HP's acquisition of Autonomy, and the associated impact on the expected financial performance of the business over the long-term. The balance of the impairment charge is linked to the recent trading value of HP stock.

19

These improprieties were discovered through an internal investigation after a senior member of Autonomy's leadership team came forward following the departure of Mike Lynch on May 23. Based on this information, HP initiated an intense internal investigation into the allegations, including a third-party forensic review of Autonomy's historically financial results.

HP has contacted the SEC's Enforcement Division and the U.K's Serious Fraud Office. We have requested that both agencies open criminal and civil investigations into this matter. In addition, HP intends to seek redress against various parties in the appropriate civil courts to recoup what we can for our shareholders.

60.    On this news, HP stock dropped $1.59 per share or nearly 12%, to close at $11.74 per share on November 20, 2012.

61.    The defendants had access to—and ignored—the many red flags present before the Autonomy acquisition. The red flags included, but were not limited to concerns about Autonomy's financial statements from hedge fund investors, media, and analysts, the large goodwill and intangible assets HP was forced to book in acquiring Autonomy, opposition to the transaction from defendant Lesjak, Larry Ellison's (Oracle's CEO) vocal statements regarding Autonomy's overvaluation, and other similar red flags.

62.    In 2011 the HP Board authorized an additional $10 billion to its stock repurchase program, which already had $5.9 billion in it. Because HP stock was grossly inflated due to the Autonomy acquisition, the repurchase substantially damaged HP, which was overpaying to purchase its own stock. From August 2011 to October 2012 the Board caused HP to repurchase $2.1 billion worth of HP stock at inflated prices.

63.    As a result of the wrongdoings complained of in this complaint, HP has suffered significant pecuniary damages and damage to its reputation and goodwill.

## Breach of Fiduciary Duties

20

64.     Obviously, HP's officers and directors had and have a fiduciary duty to the company and its shareholders.

65.     In addition to these fiduciary duties, the members of the Audit Committee and Finance and Investment Committee had additional responsibilities. Audit Committee members owed specific duties to HP to help the board with "risk assessment and risk management." These members were responsible for the "integrity of HP's financial statements." Audit Committee members also had to "review the adequacy and effectiveness of HP's internal controls, including any significant deficiencies in such controls and significant changes or material weaknesses in such controls...." The HP Board classified Thompson, Babbio, Baldauf, and Banerji as "audit committee financial expert[s]" as the term is defined by the SEC rules and regulations.

66.     Members of the Finance and Investment Committee owed specific duties to "provide oversight of the finance and investment functions of HP." It was also the job of these members to "assist the Board in evaluating investment, acquisition, enterprise services, joint venture and divestiture transactions in which HP engages as part of its business strategy from time to time." The committee members also had the duty to "evaluate the execution, financial results and integration of HP's completed" acquisitions.

67.     The Individual Defendants, due to their position of power and access, were able to and did exercise direct and indirect control over the wrongful acts discussed in this complaint.

68.     The Individual Defendants had access to diverse, non-public information about the true value of Autonomy.

69.     At all relevant times, the Individual Defendants were agents of each other and of HP and were acting within the course and scope of that agency.

21

70. Each Individual Defendant, being an officer or director, owed a duty of loyalty and good faith and an exercise of due care and diligence. The Individual Defendant's conduct, as discussed in this complaint, involves a willful, knowing, and culpable violation of this duty. They were aware of or recklessly disregarded (and should have been aware of) the risk involved with the Autonomy transaction and the accounting improprieties. HP's Board ratified the conduct of the Individual Defendants.

71. The Individual Defendants failed to prevent other Individual Defendants from performing these illegal actions and failed to prevent HP from wasting assets and losing money by acquiring Autonomy at an inflated price.

72. In committing the wrongful acts alleged herein, the defendants have pursued a common course of conduct and have acted in concert with and conspired with one another in furtherance of a common plan. In addition to the wrongs complained of herein, the defendants have aided and abetted one another's breaches of duty.

73. The defendants accomplished this conspiracy by ignoring, concealing, or causing others to ignorethe many red flags and warning signs leading up to the Autonomy acquisition.

74. Because the actions discussed herein occurred under the authority of the HP Board, each of the board members was a direct, necessary, and substantial participant in the conspiracy, common enterprise, or common course of conduct.

75. As discussed above, each Individual Defendant aided and abetted one another. By taking actions that substantially assisted and furthered the common course of conduct, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted in that wrongdoing, and was aware of his overall contribution to the wrongdoing.

## **Derivative and Demand Futility Allegations**

76.     Plaintiff brings this suit derivatively for the benefit of HP to recover damages that HP suffered. HP is named a nominal defendant solely in a derivative capacity.

77.     Plaintiff will fairly and adequately represent the best interests of HP by enforcing its rights.

78.     Plaintiff was a shareholder at the time of the wrongdoing and has continuously been a shareholder since that time and to the present.

79.     HP's board consists of 11 people: defendants Andreessen, Banerji, Hammergren, Lane, Livermore, Reiner, Russo, Thompson, Whitman, and Whitworth. Plaintiff did not demand from the board to file this action because such a demand is futile.

80.     Such a demand is futile because the 11 board members are named defendants who are likely to be held financially liable as a result of their violations of the Exchange Act and their fiduciary duties. Their actions were so egregious that the business judgment rule would not protect them from liability. These said actions are discussed more fully elsewhere in this complaint.

81.     The complained of acts are violations of fiduciary duties and cannot be ratified.

82.     Despite their knowledge of the wrongdoing, the Individual Defendants have not filed lawsuits against themselves or others involved.

83.     Plaintiff has not made a demand on the other shareholders of HP because HP is a public company with 1.9 billion shares and many thousands of shareholders. Making demand on such a number of shareholders in practically impossible.

## Non-Individual Defendants

84.     Deloitte LLP was hired to be Autonomy's independent auditor, but it breached its duties by failing to uncover and disclose Autonomy's accounting improprieties. Deloitte stated

23

regarding its responsibilities, "Our responsibility is to audit and express an opinion regarding on the financial statements in accordance with applicable law and International Standards on Auditing (UK and Ireland)."

85.    Deloitte failed to properly carry out its responsibilities and did not conduct itself in accordance with the above-mentioned standards, or by any acceptable accounting and auditing standards.    Deloitte acted negligently, reckless, or willfully and intentionally by failing to discover and/or the fraudulent accounting.

86.    As HP's General Counsel has stated, "critical documents were missing from the obvious places...." This alone should have alerted Deloitte to the problems.

87.    By acting as such, Deloitte aided and abetted Lynch in deceiving HP and failed to prevent the wrongful acts committed by HP's officers and directors.

88.    HP hired KPMG to conduct financial and accounting due diligence with respect to the Autonomy transaction and to protect HP from accounting improprieties. KPMG failed to do so. It was at least negligent and/or reckless in not discovering and disclosing the improprieties to HP. KPMG should have also discovered Deloitte's failure to do the same. KPMG had access to the many red flags but ignored them, thereby violating their duty to HP.

## COUNT I

### AgainstIndividual Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder

89.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.    This Count is asserted against Apotheker, Whitman, and Lesjakand is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder

24

by the SEC. These defendants knowingly or with extreme recklessness made and caused the publication of misleading statements regarding the financial health of HP, Autonomy, and the acquisition.

91.     During the relevant time period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other shareholders; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the relevant time period, did: (i) deceive the investing public, including Plaintiff and other shareholders, as alleged herein; (ii) artificially inflate and maintain the market price of HP securities; and (iii) cause Plaintiff and other shareholders to purchase or otherwise acquire HP securitiesand options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

92.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for HP securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about HP'finances and business prospects.

25

93.     By virtue of their positions at HP, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other shareholders, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

94.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of HP securities from their personal portfolios.

95.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of HP, the Individual Defendants had knowledge of the details of HP' internal affairs.

96.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of HP and Autonomy. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to HP' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of HP securities was artificially inflated throughout the relevant time period. In ignorance of the adverse facts concerning HP'business and financial condition which were concealed by defendants, Plaintiff and other shareholders purchased or otherwise acquired HP securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

97. During the relevant time period, HP securities were traded on an active and efficient market. Plaintiff and the other shareholders, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of HP securitiesat prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other shareholders known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and other shareholders, the true value of HP securitieswas substantially lower than the prices paid by Plaintiff and other shareholders. The market price of HP securities declined sharply upon public disclosure of the facts alleged herein to the injury of HP, Plaintiff, and other shareholders.

98. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

99. As a direct and proximate result of defendants' wrongful conduct,HP, Plaintiff and other shareholders suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the relevant time period, upon the

27

disclosure that HP and Autonomy had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Against The Individual Defendants,
### Violations of Section 20(a) of theExchange Act)

100.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein. This count is against the Individual Defendants.

101.    During the relevant time period, the Individual Defendants participated in the operation and management of HP, and conducted and participated, directly and indirectly, in the conduct of HP' business affairs. Because of their senior positions, they knew the adverse non-public information about HP' misstatement of income and expenses and false financial statements.

102.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to HP' financial condition and results of operations, and to correct promptly any public statements issued by HP which had become materially false or misleading.

103.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which HP disseminated in the marketplace during the relevant time period concerning HP' results of operations. Throughout the relevant time period, the Individual Defendants exercised their power and authority to cause HP to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of HP

within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of HP securities.

104. Each of the Individual Defendants, therefore, acted as a controlling person of HP. By reason of their senior management positions and/or being directors of HP, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, HP to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of HP and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff complains.

105. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by HP (and Autonomy).

## Count III

### Against the Individual Defendants for Breach of Fiduciary Duty

106. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein. This count is against the Individual Defendants.

107. As alleged in detail herein, Individual Plaintiffs, as officers and directors of HP, owed a fiduciary duty to HP. They were required to conduct themselves with due care and loyalty and manage HP in a fair, just, honest, and equitable manner.

108. Defendant Apotheker, Whitman, and Lesjak violated their duty of care by making improper statements in HP's press releases, conference calls, and other public disclosures. They breached their duty of care, good faith, and loyalty.

109. The Individual Defendants who were directors owed HP the highest duty of care. They failed to properly conduct due diligence with respect to the Autonomy acquisition. They

29

also breached their duty by causing, or allowing, HP to repurchase its own stock at an inflated price.

110. The Individual Defendants who were Audit Committee members breached their duty by knowingly or recklessly reviewing and approving improper statements in HP's public filings, press releases, and earnings conference calls. Additionally, they failed to conduct due diligence with regard to HP's acquisition of Autonomy.

111. The Individual Defendants who were members of the Finance and Investment Committee breached their duty by allowing HP to materially overpay for the acquisition of Autonomy despite the numerous red flags of which they were aware or should have been aware.

112. As a direct and proximate result of the HP Individual Defendants' foregoing breaches of fiduciary duties, HP has suffered significant damages, as alleged herein.

113. Plaintiff, on behalf of HP, has no remedy at law.

## Count IV

### Against HP Individual Defendants for Waste of Corporate Assets

114. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein. This count is against the Individual Defendants.

115. Defendants Apotheker, Thompson, Gupta, Banerji, Reiner, Hammergren, Andreessen, Lane, Russo, Livermore, Robison, Babbio, Baldauf, and Senequier wasted HP's corporate assets by failing to conduct adequate due diligence with respect to the Autonomy acquisition.

116. The Individual Defendants that were directors wasted HP's corporate assets by authorizing and effectuating the repurchase of HP's own stock at inflated prices.

30

117.     The Individual Defendants also wasted corporate assets by improperly paying compensation and bonuses to officers and directors who failed to do their job with respect to the Autonomy acquisition and by paying compensation to KPMG and other accounting and auditing firms who failed to properly discover and disclose the accounting improprieties, causing HP to materially overpay for Autonomy.

118.     The corporate waste has damaged HP and the Individual Defendants are liable to HP for this corporate waste.

119.     Plaintiff, on Behalf of HP, has no remedy at law.

## Count V

### Against the Individual Defendant for Unjust Enrichment

120.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein. This count is against the Individual Defendants.

121.     At the time of HP's misstatements and at all times stated herein, the Individual Defendants received bonuses, stock options, stock appreciation rights, and/or similar such compensation from HP in breach of their fiduciary duties. The Individual Defendants were unjust enriched thereby.

122.     To remedy the Individual Defendants' unjust enrichment, this Court should order them to disgorge all proceeds that the Individual Defendants received.

## Count VI

### Against Defendant Lynch for Aiding and Abetting Breaches of Duty

123.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

31

124.     Lynch aided and abetted the breaches of fiduciary duty by other Individual Defendants.

125.     As fully alleged herein, Individual Defendants breached their fiduciary duties. Lynch participated in those breaches in order to further his own interests. Lynch benefited monetarily from the sale of Autonomy to HP while colluding in or aiding and abetting the Individual Defendants' breaches.

## Count VII

### Against Deloitte for Aiding and Abetting Breaches of Fiduciary Duty

126.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

127.     Deloitte aided and abetted Individual Defendants in breaching their fiduciary duty owed to HP.

128.     Deloitte participated in the breaches for the purpose of advancing its own interests. Deloitte benefited monetarily from the sale of Autonomy to HP while colluding in or aiding and abetting the Individual Defendants' breaches.

129.     Plaintiff, on behalf of HP, has no adequate remedy at law.

## Count VIII

### Against Defendant KPMG for Aiding and Abetting Breaches of Fiduciary Duties

130.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

131.     KPMG aided and abetted the Individual Defendants' breaches of fiduciary duties owed to HP.

132.     KPMG participated in the breaches for the purpose of advancing its own interests. KPMG benefited monetarily from the sale of Autonomy to HP while colluding in or aiding and abetting the Individual Defendants' breaches.

133.     Plaintiff, on behalf of HP, has no adequate remedy at law.

## Count IX

## Against Perella Weinberg and Barclays Capital for Aiding and Abetting Breaches of Fiduciary Duties

134.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This count is against Perella Weinberg and Barclays Capital.

135.     Perella Weinberg and Barclays Capital aided and abetted the Individual Defendants' breaches of fiduciary duties.

136.     They participated in the breaches for the purpose of advancing their own interests. Both benefited monetarily from the sale of Autonomy to HP while colluding in or aiding and abetting the Individual Defendants' breaches.

137.     Plaintiff, on behalf of HP, has no adequate remedy at law.

## Count X

## Against KPMG for Negligence

138.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This count is against KPMG for negligence.

139.     KPMG was negligent in performing its performance of consultant and audit services to HP.    HP hired KPMG to protect HP from overpaying for the acquisition of Autonomy and from accounting improprieties.

33

140.     By agreeing to do this work, and accepting money for this work, KPMG owed a legal duty to HP to use the skill and care ordinarily used by a reasonable and competent professional.

141.     To conduct audits in compliance with the professional standard of care, KPMG was required to, amongst other things: (1) properly test and evaluate Deloitte's internal controls to provide a reasonable basis for its opinion; (2) properly assess the accounting principles, methods, and processes used by Deloitte; (3) inform HP management about material errors; and (4) advise HP's Audit Committee of internal control deficiencies.

142.     KPMG breached its duty to provide consulting and auditing services to HP at the required level of skill and care. KPMG violated its duty of care by, among other things, failing to do the four things mentioned in the previous paragraph.

143.     KPMG knew or should have known that Deloitte's audit of Autonomy was to HP because HP hired KPMG specifically to review Deloitte's audit of Autonomy. In addition, this indicates the foreseeability of the damage caused by KPMG's negligent failure to detect and/or report the material errors.

144.     KPMG's breach of duty to HP and negligence have proximately caused HP to suffer damages in an amount to be proven at trial, including, but not limited to, the substantial amount of money HP overpaid for Autonomy, fees paid to KPMG for its services, and other compensatory damages proximately caused by KPMG's negligence.

145.     HP has been damages as a direct, foreseeable, and proximate result of KPMG's negligence.

146.     The Individual Defendants who were HP directors have not taken appropriate action to hold KPMG accountable for the damages that KPMG caused to HP.

147.    Plaintiff, on behalf of HP, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of HP demands judgment against defendants as follows:

A.    Against all defendants and if favor of HP for the amount of damages sustained by HP as a result of the defendants' violation of the Exchange Act, breaches of fiduciary duties, waste of corporate assets, negligence, and aiding and abetting;

B.    Directing HP to take all necessary steps to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect HP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forth for shareholder vote, resolutions for amendments to HP's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

a.    A proposal to strengthen and make effective HP's due diligence in any future or pending acquisitions;

b.    A proposal to strengthen HP's oversight and controls over its stock repurchase program;

c.    A proposal to strengthen HP's oversight of disclosure procedures;

d.    A proposal to strengthen the HP Board's supervision of operations and develop and implement procedures for greater shareholder input into policies and guidelines of the Board; and

e.    A provision to permit HP shareholders to nominate at least three candidates to the Board.

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff, on behalf of HP, has an effective remedy;

D.      Awarding to HP restitution from defendants, and from each of them, and ordering disgorgement of all profits, benefits, and other compensation received by defendants; and

E.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 23, 2013

Shimon Yiftach
Bronstein, Gewirtz& Grossman, LLC
1625 W. Olympic Blvd, Suite 910
Los Angeles, CA 90015
(212) 740-9400


Of Counsel:
Peretz Bronstein
Bronstein, Gewirtz& Grossman, LLC
60 East 42nd Street, Suite 4600
New York, NY 10154
(212) 697-6484

**Shimon Yiftach**
**Bronstein, Gewirtz & Grossman, LLC**
**1625 W. Olympic Blvd, Suite 910**
**Los Angeles, CA 90015**
**Counsel to Plaintiff**
**Attorneys for Plaintiff**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

---

| | |
|---|---|
| SENTA WEISSMANN, Derivatively on behalf of HEWLETT-PACKARD COMPANY, | No. _____ |
| | |
| | **VERIFICATION** |
| Plaintiff, | |
| | |
| v. | |
| | |
| LEO APOTHEKER, MARGARET C. WHITMAN, CATHERINE A. LESJAK, JAMES T. MURRIN and MICHAEL R. LYNCH, DELOITTE LLP, KPMG LLP, PERELLA WEINBERG PARTNERS UK LLP, BARCLAYS CAPITAL SECURITIES LTD., G. KENNEDY THOMPSON, RAJIV L. GUPTA, SHUMEET BANERJI, GARY M. REINER, JOHN H. HAMMERGREN, MARC L. ANDREESSEN, RAYMOND J. LANE, PATRICIA F. RUSSO, ANN M. LIVERMORE, RALPH V. WHITWORTH, SHANE V. ROBISON, LAWRENCE V. BABBIO JR., SARI V. BALDAUF, DOMINIQUE SENEQUIER, | |
| | |
| Defendants, | |
| | |
| -and- | |
| | |
| HEWLETT-PACKARD COMPANY, a Delaware Corporation, | |
| Nominal Defendant. | |

---

{00071285;1}

## **VERIFICATION**

I, Steven Weissmann, as power of attorney for Senta Weissmann, declare as follows:

1.      I am over eighteen years of age and have personal knowledge of the facts contained in this Verification.

2.      I have read the foregoing complaint, which I declare to be true and correct to the best of my knowledge, information, and belief.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on January 28, 2012.

Steven Weissman
POA for Senta Weissman